DECISION.
The defendant-appellant, Altone Ali Shaheed, brings the appeal numbered C-000414 from his conviction in the case numbered B-0000465 and the appeal numbered C-010072 from his conviction in the case numbered B-0000209. These appeals have been consolidated by this court.
In the case numbered B-0000465, Shaheed was charged with aggravated robbery and aggravated murder, with each count accompanied by a firearm specification. In the case numbered B-0000209, he was charged with carrying a concealed weapon. A jury found Shaheed guilty of all charges and specifications.
The two cases have some factual links. At about 8:00 p.m., on December 25, 1999, Mabel Malcolm Washington was at work in a small grocery store operated by Cornell Hope at 516 West Liberty Street in Cincinnati. Hope was in the store's lavatory when he heard Washington exclaim, "Somebody is trying to rob us." Almost contemporaneously, he heard two gunshots, and he immediately emerged from the lavatory to find Washington prone on the floor, with her head and upper body in a pool of blood. As Hope stood beside Washington's body, he was confronted by an individual he later described to police investigators as a short, young black male, about one hundred and thirty pounds in weight, wearing a black coat, black pants, black gloves, and a black mask. The man ordered Hope to give him the contents of the store's cash register. Hope gave the man some four to five hundred dollars from his cash drawer and approximately fifty one-dollar bills from his pocket. Hope then turned his attention to Washington, and the robber fled on foot. Hope summoned police and medical personnel, but Washington died at the scene. An autopsy showed that a bullet had entered the left side of Washington's neck, had crossed part of her spine and fractured a vertebra, and had passed through her esophagus, a carotid artery, and her jugular vein, before exiting from her body.
On January 4, 2000, at about 2:00 a.m., a uniformed Cincinnati police officer, Kenneth Grubbs, was patrolling in a marked vehicle when he received a radio call to assist in the pursuit of a person who had fled after being stopped by a fellow officer. As Officer Grubbs approached an intersection at which he had a green light, a male pedestrian started to cross the street in violation of the "Don't Walk" signal. Officer Grubbs was forced to apply his brakes to avoid hitting the pedestrian. When the officer asked the pedestrian why he had not obeyed the signal, he received no response. When he asked for some identification, the pedestrian said that he had none. Because he intended to issue a citation for "jaywalking," Officer Grubbs instructed the pedestrian to stand on the sidewalk and to keep his hands where he could see them. The pedestrian then turned his back to Officer Grubbs and brought his hands to his waistband, prompting another warning. Eventually, the pedestrian produced a form of identification and placed it in the officer's hands. When Officer Grubbs then placed his hands on the pedestrian to guide him to the police car so that the identification could be verified, the pedestrian put one of his hands in a pocket of the oversized black coat he was wearing, prompting another warning to keep his hands in sight. That, however, did not prevent the pedestrian from again moving a hand toward the pocket. Officer Grubbs then noted bulges in the sleeves of the coat, and the pedestrian told him that he had an umbrella in one of them and a videotape in the other. By then another officer had arrived to assist Officer Grubbs, as the pedestrian was handcuffed and patted down. The pat-down search produced an unloaded .44-caliber revolver. A bullet of the same caliber was found in a pocket, along with a black mask, a black hat, black gloves, and the videotape. As a consequence, the pedestrian, identified as the defendant-appellant, Shaheed, was charged with carrying a concealed weapon, viz., the handgun recovered from his person.
After Shaheed was lodged in jail, events occurred that provided a factual basis for his indictment for aggravated murder and aggravated robbery. Fragments of a bullet were recovered from the pool of blood on the floor and elsewhere within Hope's store. An expert witness testified at trial that two of the three pieces of lead found at the scene of the crimes were once the same bullet. The expert stated that, while the bullet could have been fired from a weapon the caliber of which might have ranged from .38 to the extreme of .50, it was consistent with having been fired from a firearm of the same type as that recovered from Shaheed. Hope had given initial investigators a .38-caliber handgun that he kept for personal protection, but it was "dirty" and had not been recently fired.
Shaheed admitted that he had taken the .44-caliber revolver without permission from a box beneath his father's bed. Shaheed's father testified that he had had the weapon since 1980 and had kept it, along with seven bullets for it, in a box beneath his bed. He was not aware that his son had taken it until police questioned him on January 4, 2000. At that time, four of the seven bullets for the gun remained in the box. When police experts test-fired the revolver, it was found to be operable. Shaheed told police that he had fired one round from the gun in the air on New Year's Eve.
After Shaheed was jailed, his "girlfriend," Eutivia Lee, told police that she had received a telephone call from Shaheed at about 11:00 p.m. the night of the robbery and murder, in which he sounded "strange" and "desperate" and had asked to see her. He came to her apartment at 9:00 a.m. the next day, and she watched him count "a lot of money" that he had spread out on her bed. When she asked him, "[D]id you rob someone?", Shaheed answered, "Yeah, something like that," and he later said, "[There was] so much blood * * * she wasn't moving fast enough * * * I shot her."
Another witness, Marquis Gray, testified that Shaheed had come to his house on New Year's Day, "acting weird," wearing black gloves, and talking about "robbing another store." Gray testified that, in the course of their conversation, Shaheed had said, "I got away with murder * * * I shot that bitch downtown," and that he had displayed a "large gun" that he referred to as "heat" and that he had pulled "out of his pants," while indicating his intention to use it to intimidate "everybody" in a proposed robbery.
At trial, the prosecution adduced testimony from two men who were jailed in the same unit with Shaheed. Michael McDonald and James Krueger testified, in varying terms, that Shaheed had admitted that he had killed Mabel Washington, but had stated that he wished that he "hadn't" and that he "did not mean to shoot her."
Shaheed was represented by a public defender, Perry L. Ancona, who afforded what we see to be outstanding, exemplary assistance of counsel in what was obviously a difficult case. Mr. Ancona's cross-examination of the state's witnesses was aggressive and wide-ranging, exploiting the frailties of witnesses for the state and testing the opinions of the experts and their methodologies. With what Mr. Ancona had in hand, his performance was a textbook example of what can be done to require the prosecution to prove the guilt of an accused beyond a reasonable doubt.
Basically, Shaheed's defense was one of alibi, although not formally made by pre-trial notice. He testified that he had eaten lunch at his father's house sometime between 11:00 a.m. and noon on Christmas Day and had then gone to his own home, where he remained alone until the next day. Ultimately, the court instructed the jury on the defense of alibi, noting in its charge to the jury that the "defendant claims that he was at some other place at the time of the offense."
Clearly, Mr. Ancona recognized that the fundamental problem with Shaheed's defense was the lack of corroboration. Resultantly, his tactic was to question Hope's failure to identify Shaheed, to suggest to the jury that the presence of gunshot residue on the palms and backs of Hope's hands possibly indicated that he had handled a firearm at the time that Washington had been shot, and to disparage the reliability of the testimony of Lee, McDonald, and Krueger. The defense elicited testimony that Lee had received a reward of $1,000 for her assistance in the investigation. The defense further suggested that McDonald and Krueger, characterized by the defense as "jailhouse snitches," were currying favor with the investigators and the prosecutor by "flat out" lying to receive lenient treatment in their own cases in exchange for their testimony.
Mr. Ancona's successor as Shaheed's legal counsel has given us five assignments of error on appeal, and his brief details the pretrial motions made by Mr. Ancona that were chiefly designed to test the competency and admissibility of the evidence in the case that bears upon the issues in this appeal.
The first assignment of error is as follows:
 The trial court erred to the prejudice of the defendant-appellant in that it overruled his repeated requests to sever the firearms charge from the aggravated robbery and aggravated murder charges.
 The general standards that control the resolution of the issues encompassed in this assignment are set forth in the syllabus in State v. Torres (1981), 66 Ohio St.2d 340, 421 N.E.2d 1288:
 A defendant claiming error in the trial court's refusal to allow separate trials of multiple charges under Crim.R. 14 has the burden of affirmatively showing that his rights were prejudiced; he must furnish the trial court with sufficient information so that it can weigh the considerations favoring joinder against the defendant's right to a fair trial, and he must demonstrate that the court abused its discretion in refusing to separate the charges for trial.
 The Supreme Court of Ohio applied Torres when deciding State v. Schaim (1992), 65 Ohio St.3d 51, 600 N.E.2d 661. In Schaim, Justice J. Craig Wright wrote this for the majority:
 When a defendant claims that he was prejudiced by the joinder of multiple offenses, a court must determine (1) whether evidence of the other crimes would be admissible even if the counts were severed, and (2) if not, whether the evidence of each crime is simple and distinct. State v. Hamblin (1988), 37 Ohio St.3d 153, 158-159, 524 N.E.2d 476, 481-482; Drew v. United States (C.A.D.C. 1964), 331 F.2d 85. If the evidence of other crimes would be admissible at separate trials, any "prejudice that might result from the jury's hearing the evidence of the other crimes in a joint trial would be no different from that possible in separate trials," and a court need not inquire further. Drew v. United States, 331 F.2d at 90. See United States v. Riley (C.A.8, 1976), 530 F.2d 767
(inquiry need not proceed further).
 Schaim, supra at 59, 600 N.E.2d at 668. This court followed Schaim in State v. Decker (1993), 88 Ohio App.3d 544, 547, 624 N.E.2d 350, 354:
 To determine whether an accused has been prejudiced by the joinder of multiple offenses, a court must first determine (1) whether evidence of the other crimes would be admissible even if the counts were severed, and (2) if not, whether the evidence of each crime is simple and distinct.
 It is undisputed here that the decision whether to permit the prosecution to proceed jointly upon the charges against Shaheed rested within the sound discretion of the trial court, after application of the tests set down in Torres and its progeny. Here, the offense of carrying a concealed weapon was temporally distinct from the robbery and homicide, and its proof involved separate witnesses and was relatively simple. But much, if not all, of the evidence with respect to the offense committed on January 4, 2000, would, on its face, have been admissible in a separate trial of the robbery and murder charges. Therefore, Shaheed cannot be said to have been prejudiced by the denial of his motion to sever the charges. Because the record fails to demonstrate an abuse of discretion by the trial court in denying separate trials, we overrule the first assignment of error.
The second assignment reads as follows:
 The trial court erred to the prejudice of the defendant-appellant in that it improperly denied his motion to suppress evidence, [viz.,] the firearm, seized pursuant to an inappropriate stop, search seizure. As fruit of the poisonous tree, other physical items seized from appellant, and statement attributed to him, should also be suppressed.
We disagree.
Officer Grubbs encountered Shaheed in what he described as a high-crime area, in the very early hours of the morning. His initial inquiry of Shaheed into whether he had seen the traffic signal was appropriate because Officer Grubbs had narrowly avoided hitting Shaheed as he walked against the signal. The officer's request that Shaheed produce identification was also an appropriate preliminary to his issuance of a citation. Shaheed's subsequent silence, followed by statements that he had no identification, brought into play R.C. 2935.26(A)(2), which specifies as follows:
 Notwithstanding any other provision of the Revised Code, when a law enforcement officer is otherwise authorized to arrest a person for the commission of a minor misdemeanor, the officer shall not arrest the person, but shall issue a citation, unless one of the following applies:
* * *
 (2) The offender cannot or will not offer satisfactory evidence of his identity.
Therefore, upon the facts, Shaheed's detention and arrest were not unlawful. Shaheed's furtive actions, especially reaching into and around the waistband of his trousers after Officer Grubbs had instructed him (understandably, in light of the circumstances) to keep his hands in sight, fully justified the pat-down search of Shaheed's person for weapons. See Terry v. Ohio (1968), 392 U.S. 1, 88 S.Ct. 1868. The search having been lawful as one being prompted by the officer's fear for his personal safety, the recovery of the revolver was also lawful, and the court did not err in overruling the motion to suppress that evidence, along with the bullets, mask, gloves, and videotape. Immediately upon his arrest, Shaheed was advised of his rights and voluntarily answered Officer Grubbs's inquiry into "where he got the gun."
The record persuades us that the court did not err in refusing to suppress any of the evidence, and that the second assignment is without merit. It, therefore, is overruled.
The third assignment asserts the following:
 Separate and apart from the search seizure arguments presented in appellant's 2nd assignment of error, the admission by the trial court of the videotape of the movie "Heat" was inherently prejudicial.
 The videotape recovered when Grubbs searched Shaheed's outer garments was entitled "Heat." Its exclusion as evidence was an objective of several pretrial motions lodged on Shaheed's behalf. As we have held supra, it was not subject to exclusion as a product of the search. Mr. Ancona objected to its admission on an independent ground when the prosecution moved it into evidence at trial, arguing that the material depicted on the videotape had "no probative value but [was] highly prejudicial," in that it permitted the jury to make "some kind of impermissible inference that if a person ha[d] the movie `Heat' then * * * it's probative that he really committed a robbery and a murder." In response to that submission, the court said,
 I'm going to overrule the objection to it being admitted; however, in an abundance of caution I will instruct the prosecution in their arguments not to refer to the contents of the tape because there's no evidence of what the contents of the tape were. No one has seen anything.
 The state's position was, and is now, that the videotape itself, but not its contents, constituted relevant evidence under Evid.R. 401, because it had the tendency to make the existence of a fact of consequence to the determination of the action more probable than it would have been without that evidence. The contention is that Shaheed's possession of a videotape entitled "Heat" connected with his remark to Marquis Gray, when Shaheed displayed the revolver, that "when you pull out this `heat' everyone [sic] going to lay down." Shaheed admitted that he had viewed the movie. The jury was not permitted to see it, and resultantly, this court is ignorant of what is portrayed on the tape.
Shaheed possessed a firearm that the prosecution claimed had been used to commit an armed robbery and a murder. Shaheed later referred to that weapon as "heat" and said that simply exposing it would terrify a victim of a robbery into submission. Resultantly, there was at least a tenuously arguable nexus between Shaheed's possession of the tape and use of the revolver. The admission of evidence on relevancy grounds is reviewed under an abuse-of-discretion standard. Arguably, the tape should not have been admitted, but the record does not suggest an abuse of discretion, especially considering that the tape was not played to the jury, and the court prohibited the prosecution from referring to it in argument. For these reasons, the court did not abuse its discretion by overruling Shaheed's objection to the admission of the videotape. His third assignment of error, then, is not well taken and is overruled.
The fourth assignment of error is this:
 The trial court erred to the prejudice of the defendant-appellant in that it overruled his motion to exclude from the jury's consideration the testimony of the "jailhouse snitches."
 The gist of this assignment is the protest that Shaheed was "given only one day's notice by the prosecution that two jailhouse snitches, pod-mates of [Shaheed] at the [Hamilton County] Justice Center, would be put on the stand as witnesses."
Shaheed's trial began on May 8, 2000, and ended on May 17, 2000. Before the proceedings on May 15, during which the prosecution proposed to adduce the testimony of Shaheed's cellmates, McDonald and Krueger, Mr. Ancona offered the following:
 Your Honor, for the record, first of all, on Friday, May the 12th, Mr. Kunkel [one of the prosecutors] provided me with copies of tape-recorded interviews of a Michael McDonald he intends to call and also a person by the name of Krueger, I think.
 Mr. Ancona stated that, although he had reviewed the witnesses' interviews, he had not had "sufficient time to properly investigate them." He acknowledged that Mr. Kunkel had advised him on May 10 that McDonald and Krueger might be called to testify, and that, on May 11, Mr. Kunkel had told him that, while investigators from the prosecutor's office had interviewed them, he had not. At mid-afternoon on May 11, Mr. Ancona was advised that only Krueger was "willing to talk" to him. Resultantly, Krueger alone was interviewed at that time. Mr. Ancona's request for a continuance of one week was granted to the extent that he was given the days of Friday, Saturday, and Sunday to investigate the two potential witnesses. On May 17, Mr. Ancona renewed his request for a continuance to afford him "sufficient time" to investigate them. The court denied that request. Mr. Ancona then moved to "exclude the testimony of any jailhouse snitches * * * being brought forward at this time." That motion was overruled.
The question becomes, then, whether, in denying a continuance at this juncture of the trial, the court abused its discretion. Secondarily, we must consider whether that refusal gave rise to palpable, perceptible prejudice.
Before the trial recommenced, the court conducted an extended discussion with counsel in chambers. The prosecutor assured the court that McDonald and Krueger would testify only as to statements purportedly made by Shaheed at the Justice Center. The court, in turn, ordered the prosecutor to provide Ancona with "a full record" of the "national * * * multistate" criminal convictions of McDonald and Krueger for impeachment purposes. The record demonstrates that both witnesses were cross-examined aggressively and extensively so that the jury was fully equipped to evaluate the credibility of their testimony. Mr. Ancona exploited every basis upon which to denigrate their testimony, emphasizing in that process each witness's previous convictions and the possibility that each had received favorable treatment because of his willingness to testify. After consideration of all the pertinent circumstances, we cannot say that the record manifests an abuse of discretion. Therefore, the fourth assignment of error is overruled.
The fifth assignment reads as follows:
 The trial court erred to the prejudice of the defendant-appellant in that it convicted him based upon a showing of insufficient evidence, and against the manifest weight of the evidence.
 Mr. Ancona moved for acquittal pursuant to Crim.R. 29 at the appropriate stages of the trial, thus raising the issue of whether the evidence adduced was sufficient, as a matter of law, to warrant the submission of the case to the jury. Both motions were overruled.
The general rules governing the disposition of the twin issues presented by the fifth assignment are set forth clearly in this court's decision in State v. Martin (1983), 20 Ohio App.3d 172, 175,485 N.E.2d 717, 720:
 As to the claim of insufficient evidence, the test is whether after viewing the probative evidence and inferences reasonably drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt. The claim of insufficient evidence invokes an inquiry about due process. It raises a question of law, the resolution of which does not allow the court to weigh the evidence.
* * *
 [As to] the claim that the judgment was against the manifest weight of the evidence * * * the test is much broader. The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.
 These rules are rubric in Ohio. And it is axiomatic that upon the trial of a case, either civil or criminal, the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts. See State v. DeHass (1967), 10 Ohio St.3d 230, 227 N.E.2d 212.
In Ohio, a court of appeals may review the weight of the evidence when resolving a claim that the judgment in a criminal case was against the manifest weight of the evidence. Then, the entire record is reviewed, and, ultimately, the court of appeals must determine whether the jury, in resolving conflicts in the evidence, clearly lost its way and created such a manifest miscarriage of justice as to require a reversal of the judgment and a new trial. A reviewing court may not overturn a jury verdict when, as we conclude here, there is substantial evidence upon which the jury could have reasonably concluded that all the elements of the offenses had been proven beyond a reasonable doubt. State v. Eley
(1978), 56 Ohio St.2d 169, 383 N.E.2d 132; State v. DeHass, supra.
After applying the rules of law to the record before us, we hold the fifth assignment of error not to be well taken, and it is overruled.
The judgments of the Hamilton County Court of Common Pleas are affirmed. Judgments affirmed.
Painter, P.J., Sundermann and Shannon, JJ.
Raymond E. Shannon, retired, of the First Appellate District, sitting by assignment.